1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| WEBSIDESTORY, INC., | CASE NO. 06CV408 WQH (AJB) |
| Plaintiff / Counterdefendant, | CLAIMS CONSTRUCTION ORDER |
| vs. | |
| NETRATINGS, INC., | |
| Defendant / Counterclaimant. | |

HAYES, Judge:

The parties have asked the Court to determine the acquired meaning of certain disputed terms in United States Patent No. 6,393,479 (the '479 Patent).

### PROCEDURAL BACKGROUND

On February 22, 2006, Plaintiff Websidestory, Inc. filed the Complaint in this matter, alleging infringement of the '479 Patent by Defendant Netratings, Inc. (Doc. # 1). On March 27, 2006, Netratings moved for a more definite statement pursuant to FED. R. CIV. P. 12(c) (Doc. # 7). On April 3, 2006, Websidestory filed a First Amended Complaint. (Doc. # 13). On April 13, 2006, Netratings answered the First Amended Complaint and asserted counterclaims for declaratory relief. (Doc. # 17). On May 5, 2006, Websidestory answered the counterclaims and asserted affirmative defenses. (Doc. # 20).

On October 12, 2006, the parties filed a joint claims construction chart, a joint claims construction worksheet, and a joint hearing statement. (Doc. # 35). In November and December 2006, the parties filed opening claims construction briefs (Docs. # 40, 41) and rebuttal claims

1  construction briefs.  (Docs. # 48, 49).  On January 24, 2007, the Court held a *Markman* hearing.

2  **BACKGROUND**

3       The '479 Patent, filed with the United States Patent and Trademark Office (PTO) on June 4,

4  1999, embodies an invention which follows and records the flow of traffic through a website.  *First*

5  *Amended Complaint*, Ex. 1 (Patent) at col. 4, ll. 35-40.  The '479 Patent sought to improve upon

6  deficiencies and weaknesses inherent in the previous methods of monitoring the flow of traffic by,

7  among other things, allowing a website operator an accurate, real-time record of the path followed by

8  a website visitor.  Patent at col. 3-4.  As the internet is increasingly used for commercial purposes,

9  information regarding website visitors and the path those visitors take through a website is

10  increasingly more valuable.  Patent at col. 1.

11       The '479 Patent follows and records the path of website visitors by producing, updating, and

12  transferring a website cookie between the website visitor's web browser and a traffic analysis server.

13  Patent at col. 4, ll. 35-60.  The cookie is either attached to a web page requested by a visitor during

14  an initial visit, or it is detected as existing in a web page request made by a visitor's browser.  By

15  examining information on a website cookie, a website owner utilizing the '479 Patent can (1) monitor

16  website traffic patterns in real time, and (2) identify the webpages requested by a visitor and the order

17  the webpages were requested.

18  **LEGAL STANDARDS GOVERNING CLAIMS CONSTRUCTION**

19       The interpretation of a patent's claims is a question of law to be decided by the Court.

20  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).  By interpreting a patent's claims,

21  a court and the parties can better understand the scope of the claims.  *Gart v. Logitech, Inc.*, 254 F.3d

22  1334, 1339 (Fed. Cir. 2001).  The goal of claims construction is to determine the meaning and scope

23  of a patent's claims.  *Anton / Bauer, Inc. v. PAG, LTD.*, 329 F.3d 1343, 1349 (Fed. Cir. 2003);

24  *Middleton, Inc. v. Minnesota Mining & Mfg. Co.*, 311 F.3d 1384, 1387 (Fed. Cir. 2002).  Only

25  disputed claim language need be construed by a court, since "claim construction is a matter of

26  resolution of disputed meanings and technical scope, to clarify and when necessary to explain what

27  the patentee covered by the claims . . . .  It is not an obligatory exercise in redundancy."  *U.S. Surgical*

28  *Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  The court's interpretation of a disputed

claim term is referred to as the "acquired meaning" of the term. *Markman*, 517 U.S. at 388; HERBERT F. SCHWARTZ, PATENT LAW AND PRACTICE § 5.I. (5th ed. 2006).

In construing the terms of a patent, the court begins with the words of the claims themselves, and those words "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citations omitted); *see also Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995). The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. Where the ordinary meaning of a claim term "as understood by a person of skill in the art" is readily apparent "even to lay judges," that meaning becomes the acquired meaning. *Phillips* at 1314; HERBERT F. SCHWARTZ, PATENT LAW AND PRACTICE § 5.I.A.2. (5th ed. 2006). A patent applicant can create and define words in a patent, as well as modify a word's ordinary and customary meaning. *Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817, 825 (Fed. Cir. 1999). When a patent applicant defines a patent term and or modifies the ordinary and customary meaning of words in a patent, the patent applicant acts as a "lexicographer," and the special meaning assigned becomes the acquired meaning. *Phillips*, 415 F.3d at 1316.

Where the ordinary and customary meaning of a term is not readily apparent, a court may look to intrinsic evidence to determine the acquired meaning of the term, including "the words of the claims themselves," the specification, and the patent's prosecution history. *Id.* at 1314. The specification[1] is always "highly relevant" and usually "dispositive" in determining the acquired meaning of a claim term . . . . " *Phillips*, 415 F.3d at 1315-16 (citations omitted) ("[The specification] is the single best guide to the meaning of a disputed term."). The context of both the particular claim and the entire patent can be helpful in determining the acquired meaning of a claim term. *Id.* at 1314. The

---

[1] A specification is statutorily required, and is the part of the patent application which titles the patent, summarizes the invention, and otherwise describes the patent in detail. HERBERT F. SCHWARTZ, PATENT LAW AND PRACTICE § 2.III.B.1. (5th ed. 2006); *see also Phillips*, 415 F.3d at 1315 (the specification describes the manner and process of making and using the patented invention).

preamble[2] is relevant to determining the scope of a claim and the acquired meaning of a claim term if the preamble is a limitation on the claimed invention or is necessary to give life or meaning to the claim. *NTP, Inc. v. Research in Motion*, 418 F.3d 1282, 1305-06 (Fed. Cir. 2005); HERBERT F. SCHWARTZ, PATENT LAW AND PRACTICE § 5.III.A. (5th ed. 2006).

If after reviewing the intrinsic evidence the court is unable to determine the acquired meaning of a term, the court may examine extrinsic evidence. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1090 (Fed. Cir. 2003). Within the class of extrinsic evidence, courts rely upon dictionaries (technical dictionaries preferably), treatises, and expert testimony. *Phillips*, 415 F.3d at 1318. Though extrinsic evidence can be useful to a court, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

## '479 PATENT, CLAIM 1

**1**. A method of processing a computer file request to retrieve a network data file comprising a website page, the method comprising:

receiving a request from a network browser for a page at a website, the page having at least one graphical element having an image source attribute that specifies a website traffic path analysis data location;

detecting if the website page request includes a website cookie having website traffic path analysis data from the network browser for the current website;

producing a website cookie in response to detecting the absence of a website cookie, wherein the website cookie contains an initial set of traffic path analysis data for the current website;

determining if the cookie for the current website has expired, if a website cookie for the current website was detected;

setting the traffic path analysis data of the website cookie to initial values if the website cookie has expired, and otherwise updating traffic path analysis data for a current website visit by the network browser by adding the current requested website page to the traffic path analysis data and thereby showing the complete path of website pages requested during the current website visit, and

providing the network browser with image source data for the graphical element of the requested page and also with the website cookie containing the website traffic path analysis data.

Patent, claim 1 at col. 12, l. 50 - col. 13, l. 10.

---

[2] The "preamble" is "an introductory statement that precedes the body of the claim." HERBERT F. SCHWARTZ, PATENT LAW AND PRACTICE § 5.III.A. (5th ed. 2006).

**THE DISPUTED CLAIM TERMS & ACQUIRED MEANINGS**

**1.  A method of processing a computer file request (Patent at claim 1, col. 12, l. 48)**

The preamble to claim 1 of the '479 Patent states: "A method of processing a computer file request to retrieve a network data file comprising a website page, the method comprising . . . ." *See* Patent at col. 12, ll. 47-48; *see also* Joint Claims Construction Chart at 1.  Websidestory argues that the preamble is not limiting, and that the phrase does not need to be construed by the Court. Netratings conceded at oral argument that the phrase is not technically in dispute, however it highlighted the phrase in support of its argument that the '479 Patent does not claim an invention which uses separate servers for website content and traffic analysis.  Transcript of Oral Argument (Tr.), January 24, 2007 at 83, 97.  Netratings noted at oral argument that a discussion regarding the number of servers claimed by the '479 Patent was more appropriate at later stages of the infringement litigation, since the issue is not specifically related to construction of disputed terms.  Tr. at 87, 93.

"Claim construction is a matter of resolution of *disputed* meanings and technical scope," and only disputed claim language needs to be construed by the Court.  *U.S. Surgical Corp.*, 103 F.3d at 1568 (Emphasis added.); *Research in Motion*, 418 F.3d at 1311.  Websidestory argues that the phrase "a method of processing a computer file request" does not need to be construed by the Court, and Netratings conceded that the plain language of the phrase was not in dispute.  The Court concludes that no construction is necessary.

**2.  Website traffic path analysis (As used in claims 1-31) (First Appearing in claim 1 at col. 12, ll. 55-56)**

Though Websidestory urges a construction of the term "website traffic path analysis," Netratings does not dispute this term except in the context of the term "website traffic path analysis data."  *See* Joint Claims Construction Chart at 2; Tr. at 48.  The Court concludes that the term "website traffic path analysis" is not in dispute and that no construction is necessary.  *See U.S. Surgical Corp.*, 103 F.3d at 1568.

/

/

**3. Website traffic path analysis data (First appearing in claim 1 at col. 12, ll. 55-56, and as used thereafter in claims 1-31)**

The parties dispute the meaning of the phrase "website traffic path analysis data," which first appears in the '479 Patent at claim 1, col. 12, l. 54.  *See* Joint Claims Construction Chart at 2.  Websidestory contends that the phrase means "data used for website traffic path analysis."  Netratings contends that the phrase has a more specific and detailed meaning, and proposes "data consisting of the actual sequence of every page at a website visited by a browser during a current visit, the clock time of each page visit obtained from the browser, and cumulative values and statistics."

Netratings contends that the specification and the claims of the '479 Patent detail and define the contents of "website traffic path analysis data," and require the phrase to include a sequence of every page visited, the visitor browser's clock time, and other cumulative values and statistics. Netratings contends that Websidestory's definition renders the word "analysis" meaningless.

Websidestory contends that Netratings' proposed construction improperly imports limitations from the specification, impermissibly limiting the scope of the '479 Patent.  Websidestory contends that the claims of the '479 Patent support its proposed, and more general, construction of "website traffic path analysis data," and further contends that it is unnecessary to utilize the specification given the clarity and plain meaning of this disputed phrase.  Websidestory disputes Netratings' assertion that the '479 Patent's claims and specification disavow or disclaim the contents of "website traffic path analysis data."

After reviewing the '479 Patent and the parties' arguments, the Court concludes that the phrase "website traffic path analysis data," has an ordinary and customary meaning consistent with Websidestory's proposed construction of "data used for website traffic path analysis."  Joint Claims Construction Chart at 2.  This construction is consistent with the use of "website traffic path analysis data" in the claims, and supported by those portions of the specification which provide specific examples of "website traffic path analysis data."  *See* Patent at col. 4, ll. 37-40; Patent at col. 5, ll. 2-4. This construction is also consistent with the presence of dependent claims, e.g. claims 2-10, which claim embodiments of the invention where "website traffic path analysis data" must include specific types of data.  Patent at col 13, ll. 10-42.

1    The doctrine of claim differentiation instructs that, ordinarily, (a) each claim in a patent has

2    a different scope, (b) a dependent claim has a narrower scope than an independent claim, and (c) an

3    independent claim has a broader scope than a claim that depends on it.  HERBERT F. SCHWARTZ,

4    PATENT LAW AND PRACTICE § 5.I.A.3.d. (5th ed. 2006); *see also Liebel-Flarsheim Co. v. Medrad,*

5    *Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).  "[T]he presence of a dependent claim that adds a particular

6    limitation raises a presumption that the limitation in question is not found in the independent claim."

7    *Liebel-Flarsheim Co.*, 358 F.3d at 910; *Phillips*, 415 F.3d at 1315.  Though that presumption can be

8    overcome where evidence favoring a different construction is "strong, . . . where the limitation that

9    is sought to be read into an independent claim already appears in a dependent claim, the doctrine of

10   claim differentiation is at its strongest."  *Liebel-Flarshiem Co.*, 358 F.3d at 910; *see also Sunrace*

11   *Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1302-03 (Fed. Cir. 2003).

12   The independent claims of the '479 Patent do not require "website traffic path analysis data"

13   to include the actual sequence of every page visited by a browser, clock times, cumulative values, or

14   statistics as proposed by Netratings.  Instead, those limitations appear in dependent claims, such as

15   claims 2, 5, and 6 of the '479 Patent.  *See* Patent at col. 13.  Accordingly, the Court concludes that

16   there is a presumption against including those limitations in the acquired meaning of "website traffic

17   path analysis data."  *Liebel-Flarsheim Co.*, 358 F.3d at 910.  Netratings attempts to rebut the

18   presumption with intrinsic evidence from the specification.  Netratings contends that "website traffic

19   path analysis data" must be defined to include the actual sequence of requested pages, clock times,

20   cumulative values, and statistics, and cites the following sections of the specification in support of its

21   argument:

22       In addition, conventional Internet-based traffic analysis tools do not indicate the actual
23       sequence, or path, followed by a website visitor from page to page of a website.  The
         website path taken by visitors can be very important . . . .

24   Patent at Background of the Invention, col. 4, ll. 19-24.

25       For every website page requested by a website visitor, the state of the visitor's browser
         is recorded.  The state includes the clock time and an indication of every page at the
26       website visited by the browser during the current visit.

27   Patent at Summary of the Invention, col. 4, ll. 37-40.

28       Next the path analysis data is initialized.  For example, cumulative data such as elapsed
         visit time is set to zero . . . .

Patent at Description of the Preferred Embodiment, col. 8, ll. 39-43.

> FIG. 8 is an exemplary cookie format such as will be passed back and forth between browser and server to track website traffic, in accordance with the invention. . . . The next cookie field is a site visit count. . . . FIG. 9 is an example of path analysis data stored in a cookie. . . .The next field is for the calculated average time between site visits, a statistic that is maintained by the traffic analysis computer. The time spent is calculated in accordance with the cookie expiration time limit . . . .

Patent at Description of the Preferred Embodiment, col. 9, ll. 10-60. Netratings asserts that the inclusion of the actual sequence, cumulative values, statistics, and clock times references in the above descriptions of website traffic path analysis data require reading those terms into the definition of "website traffic path analysis data."

After reviewing the language of the claims, the Court concludes that an ordinary person skilled in the art at the time of the invention would not include clock times and cumulative values in the definition of "website traffic path analysis data." Nor is there evidence that a person skilled in the art in 1999 would interpret "website traffic path analysis data" in that manner. In order for the Court to conclude that the specific interpretations proposed by Netratings are part of the acquired meaning, the '479 Patent would have to define "website traffic path analysis data" in a clear and precise way. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370-72 (Fed. Cir. 2005) ("When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning, he must clearly express that intent in the written description."). After reviewing the language of the specification, the Court concludes that the specification does not clearly define the term "website traffic path analysis" as including the actual sequence of pages, clock times, cumulative values, and statistics.

Though the '479 Patent specification makes reference to prior art which included data such as time stamp values, *see* Patent at col. 3, ll. 55-57, the prosecution history of the '479 Patent, and specifically the notice of allowability, does not indicate that a detailed description of data was necessary for patentability. Though the notice of allowability did reference the current requested page and the complete path of website pages as part of "website traffic path analysis data," it did not define data to include specifics such as clock times, cumulative values, or statistics. Swinton Decl. at Ex. 4, p. 30.

Finally, the Federal Circuit has stated on multiple occasions that it is improper to read

limitations from a specification into a claim.  *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005); *Phillips*, 415 F.3d at 1312.  The limitations proffered by Netratings appear in dependent claims, and the limitations are often preceded with language such as "for example," "exemplary," or "in the preferred embodiment."  The Court recognizes that it is often a "fine line" that separates "proper from improper reliance" on the specification. HERBERT F. SCHWARTZ, PATENT LAW AND PRACTICE § 5.I.A.3.b. (5th ed. 2006); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).  The Court concludes, however, that Netratings' proposed construction which includes the actual sequence of pages, clock times, cumulative values, and statistics as part of the definition of "website traffic path analysis data" improperly imports limitations from the '479 Patent specification.

After considering the parties' arguments, the intrinsic evidence presented, and the '479 Patent, the Court concludes that references to the actual sequence of pages visited, clock times, cumulative values, and statistics are not required in the definition of "website traffic path analysis data."  The Court adopts Websidestory's proposed construction, and concludes that the acquired meaning of "website traffic path analysis data" is: "data used for website traffic path analysis."

**4.  An image source attribute that specifies a website traffic path analysis data location (First appearing in claim 1 at col. 12, ll. 52-53; and as used similarly in claims 8-11, 18-20, 22, 29-31)**

Though characterized by the parties as a minor dispute, Websidestory and Netratings have not agreed to a construction of the term "an image source attribute that specifies a website traffic path analysis data location."  *See* Joint Claims Construction Chart at 1.  Websidestory contends the term should be construed as "the named location for the graphical element that specifies a website traffic path analysis data location."  Joint Claims Construction Chart at 1.  Netratings contends that the term should be construed to mean "a uniform resource locator of a location where website traffic path analysis data is sent to and received from and where the graphical element is stored."  Joint Claims Construction Chart at 1.

The Court notes initially that a large part of this disputed phrase consists of the previously construed phrase "website traffic path analysis data."  The Court also notes that the section of this

disputed phrase which reads "that specifies a website traffic path analysis data location" is not ambiguous in light of the Court's previous construction of the term "website traffic path analysis data" and the ordinary and customary meaning of the words "specifies" and "location." The parties' primary dispute here centers on the meaning of "an image source attribute."

The parties agree that "an image source attribute" refers to the location of the graphical element, and both proposed constructions include the "location of the graphical element" as part of the definition. Netratings' proposed construction adds the language "a uniform resource locator of a location where website traffic path analysis data is sent to and received." Websidestory contends that Netratings' proposed construction improperly limits the scope of the claims, defies logic, and unnecessarily injects ambiguity into the claim. Netratings contends that the '479 Patent's claims and specification require the Court to adopt Netratings' proposed construction.

In support of their proposed constructions, both parties rely on the '479 Patent specification, and neither party cites to the claims. After reading the claims in light of this disputed phrase, the Court finds that the claims are of little help in construing "an image source attribute." The specification, on the other hand, does shed light on the meaning the phrase. Specifically, the description of the preferred embodiment section of the specification notes that, "[t]hose skilled in the art will understand that a graphical element such as an image on a web page must be specified by the location of an image source file, which the browser will request when it attempts to display the web page." Patent at col. 6, ll. 48-52. Thereafter, the specification states that a tagged web page "includes a graphical element that specifies an image source file . . . ." Patent at col. 6, ll. 54-56. After considering that language in the context of the '479 Patent's claims, the Court concludes that "an image source attribute" should be construed as "the named location for the graphical element."

The Court concludes that "an image source attribute" does not require reference to a uniform resource locator, or language describing a location where data is sent and received from. Netratings draws support for inclusion of uniform resource locator from the background section of the specification. However, uniform resource locator is used in the background section of the specification to describe the internet based analysis tools method which the '479 Patent intended to displace. Furthermore, as noted by Websidestory at oral argument, utilizing uniform resource locator

could impermissibly limit the scope of the '479 Patent in regards to its use in conjunction with Intranets. Tr. at 39.  The Court concludes that Netratings' proposed construction which includes language regarding a location where "data is sent to and received from" is not required by the claim language.

After considering the Patent, the parties' arguments, and the prosecution history, the Court adopts Websidestory's proposed construction of the term "an image source attribute that specifies a website traffic path analysis data location," and concludes that the acquired meaning of the term is "the named location for the graphical element that specifies a website traffic path analysis data location."

**5. Website Page Request (First appearing in claim 1 at col. 12, l. 55, and as used thereafter in claims 1-31)**

The parties initially disputed this term, but agreed to a meaning at oral argument.  Tr. at 95, 105-07, 120-22.  The parties agree that the term should be construed as: "a request for a page and its various components."  This construction is supported by the '479 Patent's language, and the Court concludes that the construction is consistent with the ordinary and customary meaning of the term to one skilled in the art in 1999.  The Court adopts the parties' joint construction.  The Court concludes that the acquired meaning of "website page request" is: "a request for a page and its various components."

**6. Website Cookie (First appearing in claim 1 at col. 12, ll. 55-56; and as used thereafter in claims 1-31)**

Though the parties initially disputed this term, counsel for Websidestory noted at oral argument that the disagreement was "minor," and ultimately the parties agreed to a definition of the term "website cookie."  Tr. at 123-25.  The parties agreed that the term "website cookie" should be construed as: "a data structure that is written to a browser computer upon an initial visit to an Internet website in response to server-side processing and automatically provided by the browser along with a request for a page unless the browser prevents cookies or the cookie has been deleted."  The Court

adopts this construction as the acquired meaning of "website cookie."

**7. Current Website (First appearing in claim 1 at col. 12, l. 56, and as used thereafter in claims 1-31)**

Websidestory contends that the term "current website" does not require construction, while Netratings construes the term to mean "the website providing the page requested by the network browser." *See* Joint Claims Construction Chart at 3-4.  Netratings contends that the use of this term in claim 1 of the '479 Patent requires the adoption of its construction.  Websidestory contends that the meaning of "current website" would be clear to an ordinary person skilled in the art in 1999, and does not need to be construed by the Court.  If the Court requires construction of "current website," Websidestory proposes that "current" should be construed to mean "belonging to the present," and "website" should be construed to mean "a collection of thematically related, hyperlinked World Wide Web services, mainly HTML documents, usually located on a specific Web server and reachable through a URL assigned to the site."  Joint Claims Construction Chart at 3-4.

The term "current website" is neither defined nor mentioned in the specification, and appears for the first time in the second element of claim 1 of the '479 Patent as follows:

> receiving a request from a network browser for a page at a website, the page having at least one graphical element having an image source attribute that specifies a website traffic path analysis data location;

> detecting if the website page request includes a website cookie having website traffic path analysis data from the network browser for the *current website*;

> producing a website cookie in response . . ., wherein the website cookie contains data . . . for the *current website*.

Patent at col. 12, ll. 50-61 (Emphasis added.).  The term appears in a similar context in other claims. After considering the language of the claims, and particularly the context within which the terms "current website" and "current website visit" are used in the claims, the Court concludes that it would be readily apparent to a person of ordinary skill in the art in question at the time of the invention that the term "current website"  is used to refer to the web page which is requested by a visitor's network browser.  The Court adopts Netratings' proposed construction for "current website," and concludes that the acquired meaning of  "current website" is: "the website providing the page requested by the

1  network browser."

2

3  **8. Detecting if the website page request includes a website cookie having website traffic path**

4  **analysis data from the network browser for the current website (Patent at claim 1, col. 12, ll. 54-**

5  **57)**

6      Netratings contends that construction of this phrase is necessary to clarify that (a) the website

7  cookie contains the traffic path analysis data, and (b) the website page request contains the cookie.

8  Netratings' proposed construction reads: "detecting if the website page request contains a website

9  cookie for the current website from the network browser, which website cookie has website traffic

10  path analysis data."  Joint Claims Construction Chart at 2.  Websidestory contends that construction

11  of the phrase is unnecessary, and argues that Netratings is needlessly reordering words.  Joint Claims

12  Construction Chart at 2.  The terms "website page request," "website cookie," "website traffic path

13  analysis data," and "current website" have already been construed by the Court.

14      The first dispute in this phrase centers on the word "includes."  Netratings' proposed

15  construction substitutes the word "contains" for the word "includes."  *See* Joint Claims Construction

16  Chart at 2.  Netratings proposed construction begins, "detecting if the website page request *contains*

17  a website cookie," while the language of the '479 Patent reads, "detecting if the website page request

18  *includes* a website cookie."  *See* Joint Claims Construction Chart at 2.  Netratings argues that the word

19  "includes" must be replaced by the word "contains" to clarify the meaning of the '479 Patent,

20  however, Netratings does not explain why such a clarification is necessary.  Instead, Netratings simply

21  notes in its opening brief that the term "contains . . . is consistent with the ordinary meaning of the

22  word" includes, and is used in the specification.  Netratings' Opening Claims Construction Brief at

23  10.  Webster's Third New International Dictionary defines "include" as "to place, list, or rate as a part

24  or component of a whole or of a larger group, class, or aggregate," and "contain" as "to keep within

25  limits . . . to have within."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 490-91, 1143

26  (1986).

27      The Court finds that substitution of the word "contains" for the word "includes" does not

28  clarify the '479 Patent.  First, a court is not permitted to re-write the claims of the patent.  *Chef Am.,*

*Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).  Second, the specification states on at least one occasion that, "the browser . . . sends the corresponding cookie along with the request for the page," *see* Patent at col. 8, ll. 10-15.  On the basis of that language, the Court concludes that "includes," with its broader meaning, is more consistent with the specification than "contains." Finally, after reviewing the '479 Patent and extrinsic evidence, there is no evidence that "includes" should be limited to "contains."

Claims construction is "not an obligatory exercise in redundancy," *see U.S. Surgical Corp.*, 103 F.3d at 1568, and while every word in a claim has meaning, not every word requires construction. *Orion IP, LLC v Staples, Inc.*, 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005).  After consideration of the parties' arguments and the '479 Patent, the Court concludes that the word "includes" does not need to be construed, and the Court will not substitute the word "contains" in its place.  The ordinary and customary meaning of the word "includes" will control.

Netratings' proposed construction also seeks to clarify that the website traffic path analysis data is stored in the website cookie described in this phrase.  Netratings' proposed construction reads, "detecting if the website page request contains a website cookie for the current website from the network browser, *which website cookie has website traffic path analysis data*."  Joint Claims Construction Chart at 2 (Emphasis added.).   After reviewing the '479 Patent's claims and specification, the Court concludes that there is significant support for the proposition that the website cookie has website traffic path analysis data.  *See* Patent at col. 12, ll. 54-56 ("a website cookie having website traffic path analysis data"); Patent at col. 12, ll. 59-66 ("wherein the website cookie contains an initial set of traffic path analysis data for the current website" and  "setting the traffic path analysis data of the website cookie to initial values . . ."). However, the Court finds that the claim language, "a website cookie having website traffic path analysis data," requires that the cookie has the traffic path analysis data, and no construction is necessary.

**9.  Producing (First appearing in claim 1 at col. 12, l. 57, and as used similarly thereafter in claims 1-31, e.g. as "produces" in col. 14, l. 62)**

Websidestory contends that "producing" does not need to be construed by the Court, and that

its plain meaning should control.  Joint Claims Construction Chart at 4.  Netratings contends that "producing" should be construed to mean "generating," and cites the specification in support.  Joint Claims Construction Chart at 4.  Netratings contends that the specification defines "producing" as "generating."

As the terms "producing" and "generating" are similar, the Court notes disputed terms are generally to be given their ordinary and customary meaning.  *Phillips*, 415 F.3d at 1312, 1314.  Webster's Third New International Dictionary defines "produce," the root word of producing, as either "something that is brought forth or yielded either naturally or as a result of effort and work," or "to cause to have existence or to happen."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1810 (1986).  Webster's Third New International Dictionary defines "generate" as "to cause to be . . . bring into existence."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 945 (1986).

Netratings cites the specification which states, "then the traffic analysis server generates an initial cookie," for the proposition that the '479 Patent defines "producing" as "generating."  *See* Patent at col. 8, ll. 36-37.  However, in order to assign meaning to a term which is different from the term's ordinary and customary meaning, a patent applicant must define the term with reasonable precision and clarity.  *See Teva Pharms.*, 395 F.3d at 1370-72 ("When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning, he must clearly express that intent in the written description.").  After reviewing the '479 Patent's claims and specification, the Court concludes that no part of the '479 Patent defines "producing" with sufficient precision and clarity so as to define its meaning as "generating."  In fact, though the specification does use the phrase "generates an initial cookie" on one occasion, *see* Patent at col. 8, ll. 36-37, the specification also uses  the word "produced" consistent with the language of the claims.  *See* Patent at col. 6, ll. 56-58.  The Court notes again that it is improper to read limitations from a specification into a claim.  *Callirate*, 427 F.3d at 1368; *see also Phillips*, 415 F.3d at 1312.

The Court concludes that "producing" is used in the claims in accordance with its ordinary meaning, and no construction is necessary.

**10.  Initial set of traffic path analysis data for the current website (First appearing in claim 1 at**

**col. 12, ll. 59-60, and as used similarly thereafter in claims 1-31)**

The '479 Patent tracks a website visitor's traffic patterns through the use of a website cookie that is transferred between a server and the website visitor's browser. However, the first time a web user visits a website, the user's web browser will not have a website cookie for the requested website.[3] In the '479 Patent, a server will produce a website cookie which contains "an initial set of traffic path analysis data for the current website" when a browser does not send a cookie along with a request for a page. Patent at col. 12, ll. 58-61.

The parties dispute the meaning of the phrase "an initial set of traffic path analysis data for the current website." Joint Claims Construction Chart at 4. Netratings contends that the phrase means "the website traffic path analysis data for the current website, including the current website page requested and cumulative values set to zero." Websidestory argues that Netratings' proposed construction improperly imports limitations from the specification, and defines the phrase as an "initial data set of traffic path analysis data." In support of its construction, Websidestory cites to a dictionary definition of "data set," as well as to the prosecution history.

In construing the phrase "an initial set of traffic path analysis data for the current website," the Court starts by examining the claims in the '479 Patent. *Bell Communications Research, Inc.*, 55 F.3d at 620. The '479 Patent first uses the phrase at claim 1, element 3, but the language surrounding the disputed phrase does not identify or define the contents of "an initial set of traffic path analysis data for the current website." Patent at col. 12, ll. 50-61. During an updating step described in claim 1, element 5, the '479 Patent provides:

> setting the traffic path analysis data of the website cookie to initial values if the website cookie has expired, and otherwise updating traffic path analysis data for a current website visit by the network browser by adding the current requested website page to the traffic path analysis data and thereby showing the complete path of website pages requested during the current website visit.

Patent at col. 12, l. 65 - col. 13, l. 5. The Court concludes that this fifth element instructs on what is included in the term "an initial set of website traffic path analysis data for the current website."

Claim 1, element 5 requires that "a complete path" of traffic analysis data be shown after the

---

[3] A browser could also lack a website cookie for a website that the browser has already visited if the browser blocks or deletes cookies. Tr. at 123-24.

"adding the current requested page" step.  Accordingly, the Court finds that the current requested page must be part of "an initial set of traffic path analysis data for the current website" as described in claim 1, element 3 at col. 12, ll. 57-62; *see also* col. 12, ll. 54-57.  If this were not the case, it would be impossible to have the "complete path" of traffic path analysis data after execution of claim 1, element 5, because adding only the current requested page to a non-expired cookie would not indicate previous webpages visited.  This conclusion is also supported by the summary of the invention portion of the specification, which states that "[f]or every website page requested by a website visitor, the state of the visitor's browser is recorded."  Patent at col. 4, ll. 37-40.

Netratings contends that "an initial set of traffic path analysis data for the current website" must also include "cumulative values set to zero."  Joint Claims Construction Chart at 4.  In previously construing "website traffic path analysis data," the Court rejected Netratings' arguments that "website traffic path analysis data" must include cumulative values and statistics.  Consistent with that construction, the Court concludes that the '479 Patent does not require cumulative values set to zero as part of "an initial set of traffic path analysis data for the current website," since neither the claims nor the specification requires an initial set of traffic path analysis data for the current website to include cumulative values set to zero.

After reviewing the '479 Patent claims and specification, as well as the parties' arguments, the Court concludes that the acquired meaning of "an initial set of traffic path analysis data for the current website" is: "an initial set of traffic path analysis data for the current website, which includes at least the current website page requested."

## 11.  Current website visit (First Appearing in claim 1 at col. 12, l. 1, and as used thereafter in claims 1-31)

The invention embodied in the '479 Patent utilizes website cookies to track a website's usage in real-time, thereby providing a website operator with, among other things, information regarding visitor traffic patterns.  While the use of website cookies in this manner has many advantages, one, in particular, is that a cookie can be programmed to expire, allowing the invention to differentiate between multiple visits to a website by the same browser.  Claim 1 describes this aspect of the

invention as follows:

> determining if the cookie for the current website has expired, if a website cookie for the current website was detected;
>
> setting the traffic path analysis data of the website cookie to initial values if the website cookie has expired, and otherwise updating traffic path analysis data for a *current website visit* by the network browser by adding the current requested website page
> . . . .

Patent at col. 12, l. 63 - col. 13, l. 5 (Emphasis added.).  As noted in the specification, allowing for the expiration of cookies "keeps the traffic path data analysis more valid, so that separate visits are not calculated as one."  Patent at col. 8, ll. 58-64.

The chief dispute regarding the term "current website visit," centers on the related idea of a cookie "expiring."  *See* Joint Claims Construction Chart at 5.  Netratings contends that a determination as to whether a visit is "current" is solely based on the time between visits to a website by a web browser.  Accordingly, Netratings contends that "current website visit" should be construed as, "a visit to a website containing multiple web pages during which no more than a preselected time limit elapses between requests for a page at the particular website."  In support, Netratings cites to numerous references in the specification.  Joint Claims Construction Chart at 5.  Websidestory contends that the term "current website visit" does not need construction, and notes that Netratings' construction improperly limits the scope of the '479 Patent.  Joint Claims Construction Chart at 5.  Specifically, Websidestory argued at oral argument and in their briefs that a cookie could expire in ways unrelated to the passage of time.

The specification states that, "[i]n the preferred embodiment, a current visit is defined as a visit during which no more than 15 minutes elapses between requests for a page at a particular website.  Other time limits may be selected, as desired."  Patent at col. 9, ll. 46-50.  Netratings argues that this language amounts to a specific and binding definition of "current website visit."  In addition, Netratings points to the following language in the specification:

> In the preferred embodiment, the time between visits to the website is tracked by checking the timestamp data that is placed in request header information . . . . If a cookie has a timestamp value that indicates a sufficiently large amount of time has elapsed since the previous visit to the website, then that cookie is deemed expired. . . . A typical expiration time for a cookie will be approximately 15 minutes.

Patent at col. 8, ll. 53-63.  Netratings contends that this language specifically defines the way a cookie

expires in the '479 Patent.  Netratings correctly notes that the specification is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315-16.

Websidestory contends that Netratings' proposed construction with reference to the specification improperly limits the scope of the '479 Patent.  Websidestory contends that other methods of expiration are possible and within the scope of the invention, and notes that adopting Netratings' proposed construction would improperly read limitations from the specification into the claim.  Websidestory's Rebuttal Brief at 9; *see also Callicrate*, 427 F.3d at 1368; *Phillips*, 415 F.3d at 1312.  Websidestory contends that no construction is necessary, but proposes dictionary definitions of the words "current," "website," and "visit," in the alternative, and urges the Court to adopt those meanings as the acquired meaning of "current website visit" if the Court determines that construction is necessary.  Websidestory also cites the '479 Patent's notice of allowability, and notes that it does not indicate a particular methodology for expiring patents.  Swinton Decl. at Ex 4.

As noted in *Innova/Pure Water*, it is often difficult to apply two of claims constructions' most important axioms, "that (a) a claim must be read in view of the specification and (b) a court may not read a limitation into a claim from the specification."  381 F.3d at 1117; *see also Leibel-Flarsheim*, 358 F.3d at 904-05.  Here, the '479 Patent specification could be read to shed light on the term "current website visit," or limit the term.  In determining the proper construction for "current website visit," however, the Court finds instructive *White v. Dunbar*, 119 U.S. 47 (1886), where Justice Bradley stated that:

> Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express. The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it, and making it different from what it is. The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.

119 U.S. at 51-52.  Evident from this language is the import of construing the claims as they are written, and the idea that the claims themselves are what defines the invention.  "[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect . . . even where a patent describes only a single embodiment." *Innova/Pure Water*, 381

1   F.3d at 1117; *see also Electro Scientific Industries, Inc. v. Dynamic Details*, 307 F.3d 1343, 1349

2   (Fed. Cir. 2002).

3        After reviewing the use of the phrase "current website visit" in the claims of the '479 Patent,

4   the Patent specification, as well as the prosecution history, the Court concludes that Netratings'

5   proposed construction of "current website visit" improperly limits the scope of the '479 Patent by

6   reference to the specification. *See Lucent Technologies v. Extreme Networks*, 367 F. Supp. 2d 649,

7   657-59 (D. Del. 2005). In addition, the doctrine of claim differentiation, with particular respect here

8   to claims 2 and 3, supports this conclusion. *See Liebel-Flarsheim Co.*, 358 F.3d at 910.

9        Though the meaning of "current website visit" is not tied to the passage of time, it would be

10   readily apparent to a person of ordinary skill in the art at the time of the invention that the claim

11   language limits the phrase to a cookie which has not expired. Accordingly, the Court concludes that

12   the acquired meaning of "current website visit" is: "a visit to a website in which the website cookie

13   is not expired."

14

15   **12. Determining if the cookie for the current website visit has expired (First appearing in claim**

16   **1 at col. 12, ll. 62-64, and as similarly appearing thereafter in claims 1-31, e.g. "determines if the**

17   **cookie . . ." appearing in claim 22)**

18        Websidestory contends that the term "determining if the cookie for the current website visit

19   has expired" does not require construction. Joint Claims Construction Chart at 5. Netratings contends

20   that the term should be construed to mean "determining whether a preselected time limit has elapsed

21   between requests for a page at the particular website to distinguish separate visits to the same

22   website." Joint Claims Construction Chart at 5. Netratings further contends that without construction

23   of this term, it will be impossible to determine whether a website visit is "current." Websidestory

24   rejects Netratings' proposed construction as improperly using the specification to limit the scope of

25   the '479 Patent.

26        The Court has already construed the term "current website visit," and the Court has rejected

27   Netratings' argument that the expiration of a cookie must be tied to the passage of time. Accordingly,

28   in order to construe the term "determining if the cookie for the current website visit has expired," the

court need only construe the phrase "determining if the cookie . . . has expired."  With respect to this language, however, the Court concludes that the meaning is readily apparent, and no construction is necessary.  *Phillips*, 415 F.3d at 1313;  *see also Lucent Technologies*, 367 F. Supp. 2d at 657-59 (in accordance with their ordinary meanings, "marking" is construed to mean "marking," and "bytes" is construed to mean "bytes").

**13.  Setting the traffic path analysis data of the website cookie to initial values if the website cookie has expired (First Appearing in claim 1 at col. 12, ll. 65-67, and as used similarly in claims 1-31)**

The parties dispute the meaning of the phrase "setting the traffic path analysis data of the website cookie to initial values if the website cookie has expired."  *See* Joint Claims Construction Chart at 6.  Websidestory contends that the phrase does not need construction outside of the individual terms which the Court has already construed.  Joint Claims Construction Chart at 6.  Netratings contends that the phrase should be construed as "replacing existing website traffic analysis data in the website cookie with the website traffic path analysis data for the current website consisting of the current website page requested and cumulative values and statistics set to zero."  Joint Claims Construction Chart at 6.

The Court concludes that the terms "setting . . . to initial values" and "expired" have readily apparent ordinary and customary meanings, and do not need to be construed by the Court.  Though Netratings argues that "setting . . . to initial values" actually requires the replacing of the data in an expired cookie with a new set of data, the Court concludes that Netratings' proposed construction which utilizes the word "replacing" in lieu of "setting" would improperly import limitations into the claims from the specification.  *Callicrate*, 427 F.3d at 1368; *Phillips*, 415 F.3d at 1312.  The Court also notes that there is no evidence that the '479 Patent intended the word "setting" to be used in a manner inconsistent with its ordinary meaning.  *Teva Pharms.*, 395 F.3d at 1370-72.  Finally, the Court notes that it cannot re-write claims in a patent.  *Chef Am.*, 358 F.3d at 1374.

After reviewing the '479 Patent and the parties' arguments, the Court concludes that no construction is necessary.

1  /

2  /

3  /

4

5  **14. Setting the traffic path . . . and otherwise updating traffic path analysis data (Appearing in**

6  **claim 1 at col. 12, ll. 66-67)**

7          Websidestory contends that this phrase does not need construction.  Joint Claims Construction

8  Chart at 6.  Netratings contends that in order to correctly understand this phrase, one must implement

9  if-then logic.  Netratings contends that the phrase describes two distinct steps depending on whether

10  the website cookie has expired–if the cookie has expired, then one "sets" the data to initial values, and

11  if the cookie has not expired, then one "updates" the data.  Netratings contends that an expired cookie

12  cannot be "updated," and a non-expired cookie cannot be "set."  Websidestory disputes Netratings'

13  contention that an expired cookie cannot be updated, and contends that Netratings' construction inserts

14  ambiguity into the phrase.

15          The primary dispute over this phrase is whether the patent allows for traffic path analysis data

16  to be "updated" even if a website cookie has expired.  Websidestory contends that traffic path analysis

17  data can be updated even if a cookie has expired, and further, contends that the '479 Patent would not

18  function properly if it is interpreted as not allowing data associated with (but not stored on) an expired

19  cookie to be updated notwithstanding the expiration of the cookie.  Websidestory's Rebuttal Brief at

20  10.  Websidestory further contends that traffic path analysis data need not always be included in a

21  cookie.

22          Netratings contends that an expired cookie cannot be updated, and further contends that all

23  updating and data collection must be done in the website cookie.  Netratings rejects Websidestory's

24  argument that the '479 Patent claims an invention where some traffic path analysis data is not actually

25  contained in a website cookie.

26          Claim 1, element 2, requires "detecting if the website page request includes a website cookie

27  having website traffic path analysis data from the network browser for the current website."  Patent

28  at col. 12, ll. 54-58.  If a website cookie is not detected, claim 1, element 3, provides, "producing a

website cookie . . . wherein the website cookie contains an initial set of traffic path analysis data for the current website." Patent at col. 12, ll. 57-63. After reviewing these parts of claim 1, the Court concludes that "traffic path analysis data" as used in claim 1, col. 12, l. 65 - col. 13, l. 5, refers to the traffic path analysis data in a website cookie as described in claim 1, element 2, col. 12, ll. 54-61. This conclusion is supported by the specification, which notes that, "[t]he collection of website path data in the cookie permits the data to be analyzed and available for viewing in real-time." Patent at col 5, ll. 10-15.

The Court concludes that the "setting . . . and otherwise updating" of the traffic path analysis data refers to setting and updating traffic path analysis data which is in a detected website cookie. *See* Patent at col. 12, l. 55 - col. 13, l. 5. The Court also concludes that the "setting" of the traffic path analysis data of the website cookie to initial values as described in claim 1, col. 12, ll. 65-67, occurs if the website cookie has expired. If the website cookie has not expired, then claim 1 requires that the traffic path analysis data on the website cookie be "updated." The Court concludes that the "traffic path analysis data" as used in claim 1, element 5, col. 12, ll. 67, describes and refers to traffic path analysis data which is in the website cookie. The Court further concludes that the if-then logic language proposed by Netratings is readily apparent and consistent with the ordinary and customary meaning of the phrase. The Court concludes that no construction is necessary.

**15. Adding the current requested website page to the traffic path analysis data and thereby showing the complete path of website pages requested during the current website visit. (First appearing in claim 1 at col. 13, ll. 1-5, and as used similarly in claims 11 and 22)**

Websidestory contends that this phrase has an ordinary meaning, and does not need construction. Joint Claims Construction Chart at 7. Netratings contends that the phrase should be construed to mean, "appending in sequence the link for the current requested website page to the preexisting sequence of website page links in the website cookie." Joint Claims Construction Chart at 7. Websidestory rejects Netratings' proposed construction, arguing that (1) Netratings' use of the word "appending" in place of "adding" does nothing to clarify the disputed phrase, (2) Netratings' use of the word "link" is unnecessary, and improperly limits the scope of the '479 Patent, and (3) nothing

in the '479 Patent limits storing traffic path analysis data in locations other than the website cookie.

As previously concluded, the claims require that the traffic path analysis data referred to be contained in the website cookie. Accordingly, the Court adopts that part of Netratings' proposed construction which clarifies that the current requested website page is being added to the traffic path analysis data in the website cookie. Patent at col. 12, l. 55 - col. 13, l. 5. The Court concludes that the balance of this disputed phrase does not require construction. The phrase has an ordinary and customary meaning which is "readily apparent" to "lay judges," and the Court concludes that the ordinary meaning today is the same as it was when the '479 Patent issued in 1999. *Phillips*, 415 F.3d 1314; *see Lucent Technologies*, 367 F. Supp. 2d at 657 ("marking" construed as "marking"). The Court concludes that use of Netratings' proposed terms "appending" and "link" would impermissibly rewrite claim language and improperly limit the claims.

The Court concludes that the acquired meaning of this disputed phrase is: "Adding the current requested website page to the traffic path analysis data in the website cookie and thereby showing the complete path of website pages requested during the current website visit."

**16. Includes the Average elapsed time between visits (First appearing in claim 5 at col. 13, ll. 23-24, and also appearing in claim 26)**

Websidestory contends that this phrase does not need construction. Joint Claims Construction Chart at 8. Netratings contends that the phrase needs to be construed based upon Websidestory's preliminary infringement contentions. Netratings' Responsive Claims Construction Brief at 22. Netratings requests that the Court construe the phrase as, "includes a single value representing the calculated average time between visits." Netratings contends that Websidestory will attempt to read the word average out of the claim language in later proceedings. Websidestory rejects Netratings' proposed construction as improperly importing limitations from the specification and rewriting the clear claim language.

Netratings' arguments find support in the specification. The description of the preferred embodiment section of the specification describes the traffic path analysis data in a typical cookie, and notes that, "the average time between website visits is calculated by the server and kept in the cookie

. . . ."  Patent at col. 9, ll. 27-30.  The average elapsed time data is further described in the specification, as "a statistic that is maintained by the traffic analysis server computer," and which is "calculated."  Patent at col. 9, ll. 50-53.  Netratings' argument that the "average elapsed time" is represented by a single value is supported by that part of the specification which describes "average elapsed time data" as a "statistic."  In addition, Figures 8 and 9 in the '479 Patent indicate that, at least in an exemplary cookie, the average elapsed time is stored in the cookie as a single value.  The "single value" aspect of Netratings' proposed constructions is consistent with various dictionary definitions of "average," one of which is "an estimate or approximate representation of an arithmetic mean."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 150 (1986).

Websidestory does not explain how or why Netratings' proposed construction would limit the claims, and the Court agrees that Netratings' construction captures the meaning of this disputed phrase.  Accordingly, and after reviewing the '479 Patent and the parties' arguments, the Court adopts Netratings' proposed construction, and concludes that the acquired meaning of "includes the average elapsed time between visits" is: "includes a single value representing the calculated average time between visits."

**17.  Specifies a different location (First appearing in claim 10 at col. 13, ll. 41-42, and appearing thereafter in claim 31)**

This phrase appears in claims 10 and 31 of the '479 Patent.  Patent at col. 13, ll. 41-42.  In its entirety, claim 10 reads,

> **10.**  A method as defined in claim **1**, wherein the website traffic path analysis data location specified by the image source attribute specifies a different location from the location of the network data file website page.

The context in which "specifies a different location" appears in claim 31 is substantially the same as the phrase appears in claim 10.  *See* Patent at col. 15, ll. 42-45.

In conjunction with its argument that the '479 Patent does not claim an invention in which separate website content and traffic analysis servers can be utilized, Netratings argues that "specifies a different location" should be construed to mean, "specifies a different location on the same website server."  Joint Claims Construction Chart at 9.  Websidestory objects to Netratings' proposed

construction as improperly limiting the claims of the '479 Patent, and argues instead that the phrase does not warrant construction by the Court because its ordinary and plain meaning is clear on its face. Joint Claims Construction Chart at 9.

The Court has previously declined to address Netratings' argument regarding whether the '479 Patent claims an invention in which multiple servers are or can be utilized. *See, supra,* section 1 (A method of processing a computer file request).  Accordingly, and as the entirety of Netratings' arguments with respect to "specifies a different location" go to the server issue, the Court will not construe the term "specifies a different location" at this stage of the proceedings.

**18.  Setting the traffic path . . . and defining a new sequence . . . and otherwise updating . . . (Appearing in claim 11 at col. 13, ll. 61-63)**

The dispute over this phrase is the same as the dispute described above in section 14, *see supra,* (Setting the traffic path . . . and otherwise updating traffic path analysis data), and the parties' arguments as described above apply here.  *See* Websidestory's Rebuttal Brief at 9-10; Netratings' Opening Claims Construction Brief at 21-23; Joint Claims Construction Chart at 10.

The Court concluded that the disputed phrase in section 14 of this Order had an ordinary and customary meaning which not did require construction.  The disputed phrase here appears in substantially the same context as the disputed phrase in section 14, and the Court concludes that no construction is necessary.

**19.  Server system for tracking data requests for retrieval of network computer files comprising website pages (First appearing in claim 22 at col. 14, ll. 46-48 [Preamble to Claim 22]); The Server System (First appearing in claim 22 at col. 14, l. 53, and thereafter appearing in claims 23-31 at col. 15, ll. 12-45)**

The dispute over these phrases is the same as described above in section 1 (A method of processing a computer file request), and centers on Netratings' argument that the '479 Patent claims an invention which only utilizes a single server.  Joint Claims Construction Chart at 13.  The Court has previously declined to address this argument because it is not, strictly speaking, related to the

meaning of a disputed term, and Netratings conceded that its argument regarding the number of servers claimed by the '479 Patent may be more appropriately discussed at later stages of this infringement proceeding.  Tr. at 83, 97.  Accordingly, the Court concludes that no construction is necessary.  *See U.S. Surgical Corp.*, 103 F.3d at 1568; *Research in Motion*, 418 F.3d at 1311.

**CONCLUSION**

The acquired meanings of the disputed terms and phrases are set forth above.

**IT IS SO ORDERED**.

DATED:  July 10, 2007

**WILLIAM Q. HAYES**
United States District Judge